1
2
3
4
5
6                          **UNITED STATES DISTRICT COURT**
7                               **DISTRICT OF NEVADA**
8
9    ACE PROPERTY AND CASUALTY                    2:07-CV-00421-BES-PAL
     INSURANCE COMPANY, a Pennsylvania
10   Limited Liability Corporation,
                                                  **ORDER**
11                       Plaintiff,

12   v.

13   VEGAS VP, LP, a Nevada Domestic
     Limited Partnership
14
                         Defendant.
15   _____

16          Presently before the Court is Defendant Ace Property and Casualty Insurance

17   Company's ("ACE") Motion for Summary Judgment, or in the Alternative, Partial Summary

18   Judgment (#37), filed on January 28, 2008.  Plaintiff Vegas VP, LP ("VVP") filed its Opposition

19   to Motion for Summary Judgment and Countermotion for Summary Judgment (#44) on

20   February 20, 2008.  ACE filed its Response to VVP's Countermotion for Summary Judgment

21   and Reply in Support of its Motion for Partial Summary Judgment (#56) on March 12, 2008.

22   VVP filed its Reply to Response to Countermotion for Summary Judgment (#59) on March 26,

23   2008.  A hearing was held on the matter on April 22, 2008.

24                                    **I. BACKGROUND**

25          Defendant Vegas VP, LLP ("VVP") was the owner of Metropolis Lofts project ("the

26   Project") in Las Vegas, Nevada.  (Countermot. Summ. J. (#44) 2); (Plaintiff's Statement of

27   Undisputed Fact ("PSUF") (#39) ¶ 1.)  The general contractor was Residential Constructors

28   ("RC").  (Countermot. Summ. J. (#44) 2); (PSUF (#39) ¶ 2.)  The Project, which involved the

                                             1

construction of a twenty-floor condominium tower ("the Building"), was insured pursuant to an all-risk builders insurance policy, Policy No. I20708955 ("the Policy").  (Countermot. Summ. J. (#44) 2); (PSUF (#39) ¶¶ 4-7.)  The policy was issued by Defendant ACE Property and Casualty Insurance Company ("ACE").  (Countermot. Summ. J. (#44) 2); (PSUF ¶ 4.) Construction began on January 26, 2004.  (PSUF ¶ 3.)

On December 28-29, 2004, Las Vegas, Nevada experienced a relatively significant rainfall event ("the Event") during which roughly two inches of rain fell over two days. (Countermot. Summ. J. (#44) 2); (PSUF (#39) ¶¶ 8-11.)  The rainfall caused damage to portions of the interior of the Building.  (Countermot. Summ. J. (#44) 2); (PSUF (#39) ¶ 8.)  At the time of the rainfall, the exterior envelope of the Building was incomplete.  (Countermot. Summ. J. (#44) 2); (PSUF (#39) ¶ 16.)  The Building's permanent roof, windows, and walls were not in place.  (PSUF (#39) ¶ 16); (Countermot. Summ. J. (#44) 2)[1].  RC had, though, placed temporary weather protection on the structure.  (Crossmot. Summ. J. (#44) 4); (PSUF (#39) ¶ 17.)  The protection included the placement of visqueen tarps over window and wall openings.  (Cross mot. Summ. J. (#44) 12); (PSUF ¶ 18.)  Visqueen tarps also served as a temporary roof.  (Crossmot. Summ. J. (#44) 12); (PSUF (#39) ¶ 18.)

Following the Event, RC and VVP filed claims with ACE.  (PSUF (#39) ¶ 23); (Defendant's Statement of Undisputed Fact ("DSUF") (#45) ¶ 1-2.)[2]  VVP claimed coverage for "soft costs" associated with construction delay caused by the rain damage.  (PSUF (#39) ¶ 23); (DSUF (#45) ¶ 1.)  The Policy provides coverage for such costs that are incurred "due to DELAY caused by direct physical loss or damage by a peril insured to the property . . . ." (Mot. Summ. J. (#37) Ins. Policy.)  On September 23, 2005, ACE denied RC's claim, asserting that the rain damage was excluded by Exclusion S of the Policy and thus was not an insured peril.  (DSUF (#39) Ex. D.)  Exclusion S excludes loss caused by the following:

Rain, snow, sleet, sand, or dust, whether driven by wind or not, to the interior of

---

[1]VVP acknowledged this fact at the hearing on the matter as well.

[2]The parties agree that a claim was filed; however, there is a dispute as to the date on which the filing occurred.  (PSUF (#39) 23); compare (DSUF (#45) ¶ 2.)

1
2
3

any building or structure, or the property inside the building or structure, unless the building or structure first sustains Windstorm or Hail damage to its roof, windows, or walls through which the rain, snow, sleet, sand, or dust enters. (Mot. Summ. J. (#37) Ins. Policy.)

4
5
6
7
8

ACE and RC ultimately settled their dispute.  On April 2, 2007, ACE initiated the instant action against VVP, alleging that the Policy excludes coverage for VVP's soft costs claim because the costs did not arise out of damage caused by direct physical loss or damage caused by a covered peril. (Compl. (#1) ¶¶ 23-34.)

9
10
11
12
13
14
15
16
17
18
19
20

On June 20, 2007, the parties submitted a stipulated discovery plan and proposed scheduling order.  (Proposed Scheduling Order (#12).)  In it, the parties proposed what they termed to be a "rather unique preliminary Scheduling Order in order to help eliminate some of the enormous expense anticipated in this litigation."  Id. at 1. More specifically, the parties proposed that the Court address the applicability of Exclusion S to the damage at issue at the outset of the litigation.  Id. at 5.  The parties proposed to accomplish this by submitting a stipulated set of facts on the basis of which the Court could determine whether the exclusion precludes coverage by way of a motion for summary judgment.  Id. at 6.  It was further proposed that if discovery was necessary to resolve the factual disputes as to how rain entered the Building, that discovery would be completed prior to submission of the motion.  Id. On July 10, 2007, Magistrate Judge Leen approved the proposed scheduling order.  (Order (#23).)

21
22
23
24
25
26

On January 28, 2008, ACE filed its motion for summary judgment along with a statement of material facts. (Mot. Summ. J. (#38)); (PSUF (#39).)  However, the parties were not able to agree to a comprehensive joint statement of stipulated fact.[3]  (PSUF (#39)); compare (DSUF (#45).)  That notwithstanding, the parties have agreed to the facts relevant to the pertinent motion–i.e., those that bear on the issue of coverage.  Thus, the parties have agreed that water entered the Building only through one or more of the following ways:

27
28

[3]ACE has filed a motion for sanctions against VVP for its failure to comply with the Court's scheduling order.  (Mot. for Sanctions (#36).)

a. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings no temporary weather protection had been placed;

b. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings temporary weather protection had been placed that was not damaged by nevertheless leaked;

c. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings temporary exterior weather protection suffered some nature of damage during the rain events of December 28-29, 2004;

d. rain water falling and accumulating on unfinished upper concrete floor slabs of the building which rain water then ran over the edges of the concrete floor slabs or down through openings and cracks in the concrete floor slabs. (PSUF (#39) ¶ 20); (Countermot. Summ. J. (#44) 4.)[4]

## II. LEGAL STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. Lynn v. Sheet Metal

---

[4]The manner in which water may have entered the building is described in paragraph 20 of Plaintiff's Statement of Undisputed Fact (#39). Though VVP does not state specifically in its countermotion that it believes water to have entered only in one or more of the four ways described there, it does state in its opposition that "[t]he parties agree that rain entered and damaged interior portions of Metropolis during the storm." (Countermot. Summ. J. (#44) 4.) In support of this statement, VVP cites paragraph 20 of Plaintiff's Statement of Undisputed Fact (#39). Additionally, at the hearing on the pending motions, VVP agreed that water entered the Building only in one or more of the four ways described in Plaintiff's Statement of Undisputed Fact (#39). Thus, the Court concludes that VVP does not dispute that water came in only through one or more of the ways described there. Accordingly, to the extent the Policy is unambiguous, the Court will apply it to the four potential modes of entry of water described in paragraph 20 of Plaintiff's Statement of Undisputed Fact (#39).

4

1   Workers Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986); S.E.C. v. Seaboard Corp., 677 F.2d

2   1301, 1306 (9th Cir. 1982).

3          If the moving party presents evidence that would call for judgment as a matter of law

4   at trial if left uncontroverted, then the respondent must show by specific facts the existence

5   of a genuine issue for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

6   "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party

7   for a jury to return a verdict for that party.   If the evidence is merely colorable, or is not

8   significantly probative, summary judgment may be granted."   Id. at 243-50 (citations omitted).

9   "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences

10   of which the evidence is reasonably susceptible; it may not resort to speculation."   British

11   Airways Board v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978); see also Daubert v. Merrell

12   Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes

13   that the scintilla of evidence presented supporting a position is insufficient to allow a

14   reasonable juror to conclude that the position more likely than not is true, the court remains

15   free . . . to grant summary judgment.").   Moreover, "[i]f the factual context makes the non-

16   moving party's claim of a disputed fact implausible, then that party must come forward with

17   more persuasive evidence than otherwise would be necessary to show there is a genuine

18   issue for trial."   Blue Ridge Ins. Co. v. Stanewich, 142 F.3d 1145, 1143 (9th Cir. 1998) (citing

19   Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th

20   Cir. 1987)).   Conclusory allegations that are unsupported by factual data cannot defeat a

21   motion for summary judgment.   Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).   Where,

22   as here, the parties file cross-motions for summary judgment, the court must consider each

23   party's motion separately and determine whether that party is entitled to a judgment under

24   Rule 56.   In making these determinations, the court must evaluate the evidence offered in

25   support of each cross-motion.   Fair Housing Council of Riverside County, Inc. v. Riverside

26   Two, 249 F.3d 1132, 1136-37 (9th Cir. 2001).

27   ///

28   ///

1

### III. DISCUSSION

2  The central issue before the Court is whether VVP can recover for soft costs associated

3 with delay caused by rainwater that entered the Building during the Event. ACE contends that

4 coverage for such damage is excluded by Exclusion S. More specifically, ACE argues that

5 because the Building's "roof, windows, or walls" did not first sustain wind or hail damage

6 through which water entered, Exclusion S precludes coverage for the rain damage at issue

7 and, therefore, VVP is barred from recovering soft costs associated therewith. (Mot. Summ.

8 J. (#37) 2-3.) VVP disagrees, arguing that Exclusion S does not clearly and unambiguously

9 exclude coverage for the damage at issue. (Countermot. (#44) 3.)

10  Generally speaking, issues of contract construction in the context of insurance are

11 appropriate for adjudication on summary judgment. See Ellison v. California State Auto.

12 Ass'n, 106 Nev. 601, 603, 797 P.2d 975, 977 (1990) (citations omitted). "In determining the

13 meaning of an insurance policy, the language should be examined from the viewpoint of one

14 not trained in law or in the insurance business; the terms should be understood in their plain,

15 ordinary and popular sense." Nat'l Union Fire Ins. Co. v. Reno's Executive Air, Inc., 100 Nev.

16 360, 364, 682 P.2d 1380, 1382 (1984) (citations omitted).

17  In order to restrict coverage, an insurer should use language that "clearly and distinctly"

18 communicates the terms of the exclusion. Id. (citing Harvey's Wagon Wheel v. MacSween,

19 96 Nev. 215, 220, 606 P.2d 1095, 1098 (1980); Sparks v. Republic Nat. Life Ins. Co., 132 Ariz.

20 529, 535, 647 P.2d 1127, 1133 (1982)). "[A]lthough an individual clause standing alone might

21 appear to contain no ambiguity, the policy must be read as a whole in order to give a

22 reasonable and harmonious meaning and effect to all its provisions." Id. at 364, 682 P.2d at

23 1383 (citation omitted). Any ambiguity must be resolved against the insurer. Id. at 365, 682

24 P.2d at 1384 (citing Harvey's Wagon Wheel, 96 Nev. at 219-20). Clauses providing coverage

25 are to be construed broadly, while clauses excluding coverage are to be interpreted narrowly.

26 Id. (citation omitted). Where ambiguity appears to exist, the court should consider the intent

27 of the parties, the subject matter of the policy, and circumstances of its issuance. Id. (citing

28 Bonner County v. Panhandle Rodeo Ass'n, Inc., 101 Idaho 772, 776, 620 P.2d 1102, 1106

1   (1980)).    Additionally, "[t]he policy should be construed to effectuate the reasonable
2   expectations of the insured."  Id.

3          In Nevada, it is unsettled as to which party bears the burden of proving that an
4   exception to an exclusion provides coverage.  Therefore, to the extent it is relevant here the
5   Court must predict how the Nevada Supreme Court would rule.  Aeroquip Corp. v. Aetna Cas.
6   & Sur. Co., 26 F.3d 893, 894 (9th Cir. 1994) (citation omitted).  The majority of jurisdictions
7   place the burden on the insured.  Id. (collecting cases).  The Ninth Circuit has noted that "[t]his
8   allocation aligns the burden with the benefit."  Id. at 895.  The Ninth Circuit has further noted
9   that assigning the burden to the insured is consistent with the general principal that the insured
10  has the burden to prove that a covered claim falls within the scope of basic coverage.  Id.
11  Nevada, of course, places the burden on the insured to do just that.  Nat'l Auto & Cas. Ins. Co.
12  v. Havas, 75 Nev. 301, 303, 339 P.2d 767, 768 (1959) (noting that "[i]t is well established that
13  when an insured has proved a loss apparently within the terms of the policy, the burden is on
14  the insurer to show that such loss was produced by a cause which is excepted from
15  coverage.") (citation omitted).  The Court, therefore, holds that the Nevada Supreme Court
16  would assign the burden of proving that an exception to exclusion applies to the insured.

17         Exclusion S excludes loss or damage caused by the following:

18     Rain, snow, sleet, sand, or dust, whether driven by wind or not, to the interior of
       any building or structure, or the property inside the building or structure, unless
19     the building or structure first sustains Windstorm or Hail damage to its roof,
       windows, or walls through which the rain, snow, sleet, sand, or dust enters.
20     (Mot. Summ. J. (#37) Ins. Policy.)

21         Exclusion S is broad and unambiguous.  It excludes coverage for all damage caused
22  by rain entering the Building unless the "roof, windows, or walls" "first sustain[ ]" windstorm or
23  hail damage through which rain enters.  Id.  The central issue here is whether the terms "roof",
24  "windows", and "walls", as used in the Policy, refer to permanent features of the Building's
25  exterior.  The Court holds that they do.  Though the terms are not defined in the policy, they
26  are not ambiguous.  The plain and ordinary meaning of "roof" describes a permanent structure
27  that covers a building.  Likewise, the plain and ordinary meaning of "window" and "wall"
28

connotes a permanent partition or window fitting designed to bear the load of a roof and the force of the elements.

This understanding of the terms is consistent with their dictionary definitions. Webster's defines "roof" as "the outside cover of a building or structure including the roofing and all materials and construction necessary to maintain the cover upon its walls or other support." Webster's Third Int'l Dictionary 1971 (1986). "Wall" is defined as "a vertical architectural member used to define and divide space . . . especially one of the sides of a room or building that connects the floor and ceiling or foundation and roof." Id. at 2572. "Window" is defined as "an opening in a wall of a building or a side of a vehicle to admit light usually through a transparent or translucent material (as glass) usually to permit vision through the wall or side and often to admit air." Id. at 2620.

In this case, the parties do not dispute that at the time of the Event, the permanent "roof, windows, or walls" were not in place. Moreover, they agree that Building's permanent exterior did not first sustain wind or hail damage through which water entered. Instead, they have agreed that water may have entered the Building only through one or more of the following ways, none of which trigger coverage:

a. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings no temporary weather protection had been placed;

b. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings temporary weather protection had been placed that was not damaged by nevertheless leaked;

c. pre-existing openings in the building's exterior envelope that had not been completed, sealed or otherwise closed in accord with finish details as the building was still under construction and over these construction openings temporary exterior weather protection suffered some nature of damage during the rain events of December 28-29, 2004;

d. rain water falling and accumulating on unfinished upper concrete floor slabs of the building which rain water then ran over the edges of the concrete floor slabs or down through openings and cracks in the concrete floor slabs. (PSUF (#39) ¶ 20); (Countermot. Summ. J. (#44) 4.)

As to ways "a", "b", and "d", the Building did not first sustain damage to its "roof, windows, or walls" through which rain entered.  Instead, as to "a", rainwater entered through pre-existing openings that had not been completed or sealed; as to "b", it came in through pre-existing openings that had been covered with temporary weather covering but that nonetheless leaked; and as to "d", the rainwater accumulated on an upper concrete floor slab and then ran over the edges and down through the Building.  Id.  The Building did not, therefore, first sustain wind or hail damage to its "roof, windows, or "walls" through which the rain entered.  Thus, the Policy provides no coverage for damage caused by rain entering the Building in these ways.  Consequently, VVP cannot recover soft costs for delay resulting from any damage caused in these ways.

As to the mode of entry described in "c", the parties have agreed that rainwater may have entered the Building through pre-existing openings in the Building's exterior that were covered by temporary exterior weather protection which suffered some nature of damage.  As was stated earlier, the temporary weather protection consisted mainly of the use of visqueen tarps. Visqueen tarps, however, do not constitute "roof, windows, or walls" within the meaning of the Policy.  The tarps were used as a temporary precaution, presumably in the event of a rainstorm, precisely because the Building's permanent "roof, windows, or walls" had yet to be completed. Any wind damage to the visqueen tarps resulted in damage to temporary weather covering, not the "roof, windows, or walls."  Accordingly, as to any rainwater that entered through wind-damaged visqueen, the Building did not first sustain wind or hail damage to its "roof, windows, or walls."   Therefore, coverage is excluded and soft costs cannot be recovered.

To the extent that the visqueen tarps in place of the permanent roof is concerned, this result is consistent with Diep v. California Fair Plan Assoc., 15 Cal. App. 4th 1205, 19 Cal. Rptr. 2d 591 (2d. Dist. 1993).  In that case, the insured held a policy on a warehouse.  Id. at 1208, Cal. Rptr. at 593.  The policy excluded coverage for rain damage.  Id.  Like here, the policy excepted from that exclusion rain damage that resulted from water pouring into the building through a wind-damaged roof or wall.  Id.  While roof repairs were being made, the

9

1  construction company removed a portion of the roof and covered it with plastic.  Id. at 1207,

2  19 Cal. Rptr. 2d at 592.  Later, wind destroyed the plastic sheeting, and rain damaged property

3  in the warehouse.  Id. at 1208, 19 Cal. Rptr. 2d at 593.  The court in Diep held that the term

4  "roof" is "commonly considered to be a permanent part of the structure it covers" and thus was

5  not an "ambiguous or vague word."  Id.  Consequently, the exception did not afford coverage.

6  Id.

7       VVP attempts to avoid this result by distinguishing Diep.  (Countermot. (#44) 14-15.)

8  VVP argues that because in Diep the insurance contract did not cover the construction of the

9  warehouse, the holding is inapplicable.  Id.  VVP thus suggests that the expectations here

10  were different because a building that is being constructed is unlikely to have a permanent roof

11  or walls in place for any significant period time covered by the policy.  Id. at 8-9.  As a result,

12  VVP argues that its expectation was that the term "roof" would be construed as including any

13  covering that performed a similar function.  In that same vein, VVP contends that visqueen

14  tarps may serve as "windows" or  "walls."  Id.

15       In support of this position, VVP cites Homestead Fire Ins. Co. v. De Witt, 206 Okla. 570,

16  245 P.2d 92 (1952). Id. at 12-13.  In Homestead, the plaintiffs undertook to build an addition

17  to a school, the construction of which required the connection of the roof of a pre-existing

18  building to that of the addition.  Homestead, 206 Okla. at 571, 245 P.2d at 93.  The plaintiffs

19  had purchased a construction insurance policy with an exclusion identical to that at issue here

20  to cover the project.  Id. at 573, 245 P.2d at 94.  In order to connect the two roofs, the

21  contractor was forced to remove a portion of the roof of the pre-existing building.  Id.  The

22  contractor did so but covered the opening with temporary roof canvas.  Id. at 573, 245 P.2d

23  at 94.  The canvas was blown apart by the wind, and rain damage resulted.  Id.  The court held

24  that the temporary roof constituted a "roof" within the meaning of the policy and therefore

25  found coverage.  Id.

26       It is true that Diep is somewhat distinguishable from the case at bar.  There, the

27  contract at issue was not a construction contract.  As a result, the case is not on all fours with

28  the one presently before the Court.  However, the fact that the contract at issue here covers

construction, as opposed to being a general property policy, is not a critical distinction.  Even in the context of a construction contract the parties could well have negotiated for a limited exception to the rain exclusion to provide coverage in the event that damage to the interior was caused by rain entering through the permanent wind-damaged exterior once that exterior was complete.  This conclusion is consistent with the fact that the building process requires a critical decision: the builder may either complete the exterior, "drying-in" the interior, before beginning work on the interior, or begin interior work before permanently enclosing it.

VVP's citation to Homestead is unavailing.  While it is true that in Homestead the insurance contract covered a construction project, that project required the removal of a portion of the roof of a pre-existing structure.  This caused the finished interior of the pre-existing building to be exposed.  Knowing that the project required this measure, the parties in Homestead were more likely to have negotiated for a broader understanding of the term "roof"–specifically, one that included any temporary precautions taken to cover the finished interior.  The project at issue here, however, did not require the exposure of the finished interior.  As a consequence, the Homestead decision provides little guidance.

In addition to attempting to distinguish Diep, VVP contends that neither the plain and ordinary meaning of the terms "roof, window, or walls," nor the Policy itself, requires that those things be permanent.  (Countermot. (#44) 10-12.)  VVP thus contends that the visqueen tarps at issue constituted the Building's "roof, windows, or walls" for purposes of the Policy. Id. However, that the Policy does not explicitly refer to the *permanent* "roof, windows, or walls," is irrelevant insofar as the plain and ordinary meaning of those words includes a permanency requirement.  And as the Court has already stated, it believes the plain and ordinary meaning of the words do just that.  Moreover, though the dictionary definitions of the terms do not explicitly refer to a "roof, window, or wall" as a permanent feature of a building, the Court finds that such a requirement is implicit in those definitions.

VVP also urges the Court to accept its position that Exclusion S does not apply to the Building at all.  (Countermot. (#44) 8-10.)  According to VVP, if the exception to the exclusion contemplates wind or hail damage to permanent "roof, windows, or walls," the provision must

1    only apply to building's with completed exteriors.  Id. at 9.  And since the Building was not

2    scheduled to have such an exterior until the thirteenth month of the policy period, applying the

3    Exclusion would lead to absurd results–namely, that for more than sixty percent of the policy

4    period (the Policy period ran twenty months in this case) the exception to the exclusion would

5    have provided no coverage.  Id.  Thus, VVP says that exclusion can only reasonably be read

6    to apply to the completed buildings that might have been used during the construction of the

7    Building–i.e., temporary office structures or trailers used to house RC's personnel, equipment,

8    etc.  Id.  The Court finds this argument unpersuasive.  As has been noted, the parties could

9    have negotiated for a limited exception to the rain exclusion to apply to the Building after the

10   exterior was completed but before the interior was done.  Here, again, this reading of the

11   Policy is consistent with the decision a builder undertakes as to whether to begin work on the

12   interior before completing the permanent exterior.

13        Lastly, VVP contends that ACE has waived its ability to assert Exclusion S as a

14   limitation on coverage.[5] [6]  (Countermot. Summ. J. (#44) 16-18.)  Under Nevada law, "an

15   insurer does not waive its right to assert an exclusion where it has provided its insured with

16   adequate notice of an unambiguous exclusion."  Vitale v. Jefferson Ins. Co. of New York, 116

17   Nev. 590, 597, 5 P.3d 1054, 1059 (Nev. 2000).  In Vitale, the Nevada Supreme Court noted

18   its agreement with Intel Corp. v. Hartford Accident & Indemnity Co., 952 F.2d 1551 (9th Cir.

19   1991), in which the Ninth Circuit held that under California law, waiver applies only where the

20   insurer has committed some misconduct, such as failing to thoroughly investigate a claim,

---

[5]VVP argues, in fact, that ACE is barred from asserting Exclusion S by the doctrine of laches, not waiver. (Countermot. Summ. J. (#44) 16-18.)  The Nevada Supreme Court, however, has generally applied the law of waiver in determining whether an insurer has relinquished its right to assert a particular exclusion where there is an allegation of misconduct and detrimental reliance.  See Vitale v. Jefferson Ins. Co. of New York, 116 Nev. 590, 597, 5 P.3d 1054, 1059 (2000) (holding that the insurer promptly informed the insured that it was denying coverage based on a particular exclusion and, therefore, no waiver had occurred).

[6]It is unclear whether VVP is asserting that ACE is barred from asserting any reliance on Exclusion S at all, or only in the event that the Court reaches ACE's alternate request for partial summary judgment.  In order to ensure a comprehensive resolution to the issues presented here, the Court will construe VVP's brief as claiming that ACE has waived its right to assert Exclusion S generally, not merely in the event that the Court reaches ACE's motion for partial summary judgment.

1    "sandbagging" the insured, or where an insured has relied on a misrepresentation made by

2    the insurer.  Intel, 952 F.2d at 1556.

3        In support of its position that it did not receive notice of ACE's intent to rely on Exclusion

4    S, VVP cites the affidavit of Gary T. Leach, VVP's on-site representative at the time of the

5    Event.  There, Leach states that ACE "never indicated to Vegas VP that it would seek to limit

6    compensation on the basis of how water entered Metropolis." (Leach Aff. ¶ 9.)[7]  Leach further

7    states that only after ACE filed the instant action did it "claim[ ] for the first time that its liability

8    under the policy was limited to damage caused by rain water that entered Metropolis only by

9    a specific means."  Id. ¶ 11.

10       On June 27, 2005, however, six months after the Event, VVP submitted to ACE a

11   document entitled "Schedule of Forecasted Additional Project Costs Resulting From a

12   Seventy-Workday Delay Builders' Risk Insurance Claim - Metropolis Project" ("the Forecast").

13   (DSUF (#45) Ex. A.)  Three months later, on September 12, 2005, ACE responded to the

14   Forecast with a letter noting the potential applicability of Exclusion S.  (ACE Resp. (#56) Ex.

15   1.)  The letter was addressed to Missi Turner, a claims assistant with Colemont Insurance

16   Brokers, VVP's insurance broker, and sender of the Forecast.  Id.  In the letter, ACE requested

17   that Turner forward the letter to VVP.  Id.  Additionally, on September 14, 2005, ACE sent a

18   copy of its September 12, 2005, letter to John Prince of the Adams Insurance Agency, VVP's

19   representative, "for the purpose of insuring that the enclosed letter dated September 12, 2005

20   ultimately reaches its intended recipient, Vegas V.P., L.P. ("Vegas")." (ACE P&C's Response

21   to Facts (#57) Ex. B-2.)

22       In his deposition, Leach acknowledged receiving copies of these letters from Prince

23   before October 2005.  (Leach Dep. 40:2-11.)  He also stated that he received copies directly

24   via federal express.    Id. at 40:15-18.    Thus, Leach's conclusory affidavit statement

25   notwithstanding, it appears that ACE did, in fact, notify VVP promptly as to its intention to raise

26   Exclusion S as a limitation of coverage.  Given Leach's acknowledgment of the receipt of

27   _____

28       [7]The Leach Affidavit can be found attached as Exhibit I to VVP's Statement of Undisputed Fact
     (#45).

1  these letters, no reasonable juror could conclude that VVP was not on sufficient notice of
2  ACE's intention to limit coverage via Exclusion S.  See Hambleton Bros. Lumber Co. v. Balkin
3  Enter. Inc., 397 F.3d 1217, 1225 (9th Cir. 2005) (noting that "[u]nder our 'sham' affidavit rule,
4  'a party cannot create an issue of fact by an affidavit contradicting his prior deposition
5  testimony.'") (quoting Kennedy v. Allied Mut. Ins. Co., 252 F.2d 262, 266 (9th Cir. 1991)).
6  Thus, ACE has not waived its ability to assert Exclusion S here.

7          Therefore, there being no genuine issue of material fact as to whether coverage for soft
8  costs caused by rain damage exists in this case, the Court grants ACE's motion for summary
9  judgment as to its first claim for relief.[8]

10                                **IV. CONCLUSION**

11         Accordingly, IT IS ORDERED that ACE's Motion for Summary Judgment (#37) is
12 GRANTED.

13         IT IS FURTHER ORDERED that VVP's Countermotion for Summary Judgment (#44)
14 is DENIED.

15         The Clerk shall enter judgment in favor of ACE as to its first claim for relief.

16         DATED: This 8th day of May, 2008.

17

18

19                                    _____
20                                    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26 _____

27      [8]Because the Court holds in favor of ACE on the issue of coverage under Exclusion S, it need
   not reach ACE's alternate request that the Court hold that any damage caused by rain entering the
   Building through any means other than wind-damaged temporary weather covering is excluded.  (Mot.
28 Summ. J. (#38) 14.)  Accordingly, the issue of whether under Nevada laws the concurrent cause doctrine
   or the efficient proximate cause doctrine would control causation issues here is moot.

                                          14